**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| A.M.P., G.V.S., C.M.G., Felipe Emmanuel Dzib Cohuo, A.A., B.M.R., K.H.A., A.C.C. on behalf of his minor son, S.C.L., and J.N.C., on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; <br> ALEJANDRO MAYORKAS, Secretary of Homeland Security; <br> U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS); and <br> UR MENDOZA JADDOU, Director, USCIS, <br><br> *Defendants*. | Case No. 4:23-cv-13230-SDK-EAS <br><br> CLASS ACTION |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs and others in their proposed class are undocumented noncitizens who survived serious crimes that occurred in the United States. Many people in Plaintiffs' position fear interactions with law enforcement officers because those interactions—no matter how brief, and no matter how innocent—could result in their removal from the country. As a result, before Congress created the "U visa," which is the subject of this case, many crimes against people without immigration status went unreported. Because the crimes were not reported, they could not be investigated or

prosecuted. And when crimes are not investigated, everyone in the country, citizens and noncitizens alike, becomes less safe.

2.      Congress expressly recognized these links and addressed them by creating U nonimmigrant status, often called the "U visa." The U visa is available to noncitizen victims of certain serious crimes if they report those crimes to law enforcement and cooperate in the investigation or prosecution of the crime. Congress recognized that, by providing temporary status to noncitizen crime victims, the U visa would incentivize noncitizens to engage with law enforcement and thus improve public safety. The effectiveness of the U-visa program, however, turns on whether a noncitizen victim of crime can *timely* receive protection, because a person who must remain in the shadows for years after reporting a crime is less likely to take the risk of approaching law enforcement.

3.      Defendant U.S. Citizenship and Immigration Services ("USCIS"), which is responsible for adjudicating U-visa petitions, understands this link. In 2007, USCIS recognized the 10,000 annual U visas that Congress provided significantly underestimated the need. As a result, USCIS issued regulations mandating that everyone who would be eligible for a U visa but for the numerical limit be placed on a regulatory waiting list, a step that would provide both work authorization and temporary protection from removal.

4.      USCIS never fulfilled its own regulatory mandate. Rather, it allowed delays for placement on the waiting list to soar to nearly five years by fiscal year 2020.

5.      In the meantime, Congress provided USCIS with a powerful tool to counteract these delays. In 2008, Congress added language to the U-visa statute making

U-visa petitioners with pending, bona fide petitions eligible for work authorization. Review by USCIS to see if a petition is bona fide is much less intensive than the full merits determination required for placement on the regulatory waiting list. Congress thus allowed—and indeed required—USCIS to dramatically reduce the time it spends reviewing U-visa petitions before deciding whether to grant or deny interim relief.

6.     USCIS, however, did not implement a streamlined bona fide determination process until June 2021—12 and a half years later.

7.     The shift to a bona fide determination process dramatically reduced the amount of time USCIS must spend with a U-visa petition before granting interim relief. Given the brevity of the required assessment, Plaintiffs and other petitioners anticipated that the delay for obtaining interim relief would decrease after implementation of the bona fide determination process. Instead, it now takes USCIS *longer* to issue a streamlined bona fide determination than it did to issue a full merits determination for the regulatory waiting list in 2020.

8.     These ever-growing and extreme delays for interim U-visa relief are unreasonable under the Administrative Procedure Act.

**JURISDICTION AND VENUE**

9.     This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

10.     This Court has jurisdiction over the claim alleged against Defendants under 28 U.S.C. § 1331.

11.     This Court has authority to grant the requested declaratory and injunctive relief under 5 U.S.C. §§ 701–706, 28 U.S.C. §§ 2201–02, and Federal Rules of Civil Procedure 57 and 65.

12.     Venue is proper in this District and Division under 28 U.S.C. § 1391(e)(1), because Plaintiffs A.M.P., G.V.S., K.H.A. and other, unnamed class members reside in this District and Division and no real property is involved in this action.

## PARTIES

13.     Plaintiffs are noncitizens who applied for U visas more than two years ago and who have not yet received a "bona fide determination"—i.e., an *initial* adjudication from Defendants that could provide them with work authorization and temporary relief from deportation while they await full adjudication of their petitions.

14.     Plaintiff A.M.P. resides in Ypsilanti, Michigan. A.M.P. applied for a U visa on October 12, 2021.

15.     Plaintiff G.V.S. resides in Saginaw, Michigan. G.V.S. applied for a U visa on November 6, 2018.

16.     Plaintiff C.M.G. resides in Galveston, Texas. C.M.G. applied for a U visa on November 9, 2020.

17.     Plaintiff Felipe Emmanuel Dzib Cohuo resides in San Francisco, California, with his wife and young son, who are derivatives on his U-visa petition. Felipe applied for a U visa on September 23, 2020.[1]

18.     Plaintiff A.A. resides in North Potomac, Maryland. A.A. applied for a U visa on July 19, 2021.

---

[1] Felipe Emmanuel Dzib Cohuo has chosen not to proceed anonymously.

19.     Plaintiff B.M.R. resides in Elkhart, Indiana. B.M.R. applied for a U visa on September 28, 2020.

20.     Plaintiff K.H.A. resides in Pontiac, Michigan. K.H.A. applied for a U visa on November 27, 2020.

21.     Plaintiff A.C.C., on behalf of his minor son, S.C.L., resides in Goshen, Indiana with his minor son. S.C.L. applied for a U visa on October 7, 2021.

22.     Plaintiff J.N.C. resides in Chicago, Illinois. J.N.C. applied for a U visa on May 6, 2021.

23.     Defendant U.S. Department of Homeland Security ("DHS") is the executive department of the federal government charged with implementing immigration laws and policies.

24.     Defendant Alejandro Mayorkas is the Secretary of DHS. Secretary Mayorkas is sued in his official capacity.

25.     Defendant USCIS is the agency within DHS tasked with adjudicating applications and petitions for various types of immigration relief, including all stages of the U-visa adjudication process, including making bona fide determination adjudications.

26.     Defendant Ur Mendoza Jaddou is the Director of USCIS. Ms. Jaddou is sued in her official capacity.

## BACKGROUND

### I.     The U Visa

27.     When it reauthorized the Violence Against Women Act in 2000, Congress recognized that, because of their precarious status in the United States, "[i]mmigrant women and children are often targeted to be victims of crimes." Victims of Trafficking &

Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, § 1513(a)(1), 114 Stat. 1464, 1533 (2000) (codified at 8 U.S.C. § 1101 (note)). This vulnerability is particularly true of survivors of intimate partner violence, whose abusers often use the survivor's lack of immigration status, and the threat of contacting law enforcement to initiate removal proceedings, as a means of exercising and maintaining control.

28.    Congress recognized that both noncitizens and U.S. citizens alike would benefit if survivors of intimate partner violence and other noncitizen crime victims were "able to report [the] crimes to law enforcement and fully participate in" the investigation and prosecution of the crimes. VTVPA, Pub. L. No. 106-386, § 1513(a)(1)(B), 114 Stat. at 1533. Allowing noncitizens to feel safe doing so "strengthen[s] the ability of law enforcement agencies to detect, investigate, and prosecute" serious crimes—and thus improves public safety for everyone. *Id.* § 1513(a)(2)(A), 114 Stat. at 1533. It also "offer[s] protection to victims of [serious crimes] in keeping with the humanitarian interests of the United States." *Id.*

29.    To incentivize noncitizens to report crimes and thus advance those dual ends, Congress created the U visa. However, Congress capped the number of crime victims that may receive U visas at 10,000 in any year, excluding derivative family members. 8 U.S.C. § 1184(p)(2)(A)–(B). Noncitizens may apply for a U visa if they have been the victim of a serious crime from an enumerated list, or an "attempt, conspiracy, or solicitation to commit" such a crime, in the United States. *Id.* § 1101(a)(15)(U)(iii). The list of covered crimes is as follows:

> rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment;

blackmail; extortion; manslaughter; murder; felonious assault; witness
tampering; obstruction of justice; perjury; [and] fraud in foreign labor
contracting.

*Id.* Any "similar activity in violation of Federal, State, or local criminal law" can also

give rise to U-visa eligibility. *Id.*

30.     Noncitizen victims of these crimes (and their qualifying relatives) are

eligible for a U visa if they "suffered substantial physical or mental abuse as a result of"

the crime, "possess[] information" about the crime, and "ha[ve] been helpful, [are] being

helpful, or [are] likely to be helpful to" officials who are "investigating or prosecuting"

the crime. *Id.* § 1101(a)(15)(U)(i)-(ii).

31.     To satisfy the last of these criteria, a U-visa petitioner must provide "a

certification from a Federal, State, or local" law enforcement official attesting to the

petitioner's past, present, or likely future helpfulness. *Id.* § 1184(p)(1).

32.     U-visa petitioners may also separately submit an application asking

USCIS to waive any applicable grounds of inadmissibility to the United States. USCIS

has discretion to waive such grounds "in the public or national interest." *Id.*

§ 1182(d)(14).

33.     Congress intended U-visa petitioners to benefit from their petitions

quickly. In the U-visa statute, Congress explained it intended the statute to "give[] law

enforcement officials a means to regularize the status of cooperating individuals *during*

investigations or prosecutions." Pub. L. No. 106-386, § 1502(a)(2)(B), 114 Stat. at 1464

(emphasis added).

34.     A U visa is generally valid for four years. 8 U.S.C. § 1184(p)(6). During

that time, both the principal petitioner and their derivatives are eligible to work in the

United States. *Id.* § 1184(p)(3). Anyone with principal or derivative U-visa status who has "been physically present in the United States for a continuous period of 3 years" may generally apply to adjust status and become a lawful permanent resident of the United States (i.e., to receive a "green card"). *Id.* § 1255(m)(1).

## II.    Defendants' Unreasonable Delays

### A.    Defendants' Seven-Year Delay in Implementing the U Visa

35.    Congress enacted the statutory provisions creating the U visa in 2000, and those provisions "went into effect upon enactment." Michael D. Cronin, *Victims of Trafficking and Violence Prevention Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* 2 (Aug. 30, 2001).[2]

36.    Defendants' predecessor agency, the Immigration and Naturalization Service ("INS"), immediately recognized that the creation of the U visa "reflects the United States government's . . . intent to vigorously pursue . . . the protection of victims." *Id.* at 1. INS expressly acknowledged Congress's dual purposes of aiding law enforcement and protecting noncitizens who endured serious crimes in the United States. *Id.* at 1 n.3.

37.    Defendants, however, did not promulgate regulations implementing the U visa for seven years. *See* USCIS, *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53,014 (Sept. 17, 2007). Further, Defendants only began providing temporary protection from removal to those who might be eligible for U visas starting in 2007, and they did not process U-visa petitions or begin

---

[2] https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/IMM-Gov-DOJMemo TUVisa-08.03.01.pdf.

granting U visas until fiscal year 2009. *See* USCIS, *Number of Form I-918 Petitions for U Nonimmigrant Status By Fiscal Year, Quarter, and Case Status* ("I-918 Petitions").[3]

**B.    Defendants' Ever-Increasing Delays in Adjudicating U-Visa Petitions for the Regulatory Waiting List**

38.    When it finally implemented the U visa in 2007, USCIS "anticipate[d] that within the first few fiscal years after publication of this regulation, it would receive petitions for U nonimmigrant status from more than 10,000 principal [petitioners]." 72 Fed. Reg. at 53,027.

39.    USCIS recognized that leaving noncitizen crime victims who were unable to quickly receive U visas because of the statutory cap without recourse would undermine Congress's goals of improving public safety by incentivizing noncitizens to report and cooperate in the investigations and prosecutions of serious crimes and protecting the victims of such crimes to allow that cooperation. *Id.* USCIS thus saw the need for "a stable mechanism through which victims cooperating with law enforcement agencies can regularize their immigration status." *Id.*

40.    USCIS, by regulation, created a waiting list process to address this problem. The waiting list regulation provides that "once the numerical limit has been reached in a particular fiscal year, all pending and subsequently submitted petitions will continue to be reviewed in the normal process to determine eligibility." *Id.*

41.    In order to place a petitioner on the waiting list, USCIS undertakes a full determination of whether the petitioner is eligible for a U visa. *See* USCIS Policy

---

[3] https://www.uscis.gov/sites/default/files/document/data/i918u_visastatistics_fy2023 _qtr3.pdf.

Manual, vol. 3, part C, ch. 6.[4] This requires USCIS to, at a minimum, complete the

following steps:

- Review all petition forms for completeness;

- Review and assess the evidence in support of the petition, which often runs to hundreds of pages;

- Complete a criminal background check and conduct reviews of DHS and other government databases for information about the petitioner;

- If necessary, contact law enforcement to confirm the petitioner's cooperation;

- Determine if the petitioner is inadmissible on any ground and, if so, adjudicate an application for a waiver, which entails review of a separate form and evidence submitted in support of that form; and

- If it appears that the evidence is insufficient to approve a U visa, issue a Request for Evidence or Notice of Intent to Deny outlining deficiencies and the additional evidence needed, wait up to 90 days for a response, and then assess the response.

42.     When USCIS places a petitioner on the regulatory waiting list, it grants

protection from deportation in the form of "deferred action or parole to [that petitioner]

and qualifying family members." 8 C.F.R. § 214.14(d)(2). This step also enables

petitioners and their families to receive work authorization while awaiting their U visas.

*See id.* § 274a.12(c)(11) & (14).

43.     Under Defendants' regulations, "[a]ll eligible petitioners who, due solely

to the cap, are not granted [principal U] status *must* be placed on a waiting list." *Id.*

§ 214.14(d)(2) (emphasis added). Defendants therefore had a binding legal obligation to

place everyone who submitted an approvable U-visa petition on the waiting list. This

---

[4] https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-6.

obligation was crucial, because petitioners waiting to be placed on the waiting list did not receive deferred action or work authorization. *See id.* § 214.14(d)(2).

44.     USCIS set the goal of adjudicating U-visa petitions within six months. USCIS, *USCIS Response to the Citizenship and Immigration Service Ombudsman's (CISOMB) 2012 Annual Report to Congress* 5.[5] This timeline would have comported with Congress's intention for U-visa petitioners to have their status regularized quickly.

45.     USCIS's prediction that the number of U-visa petitions would soon exceed the statutory cap proved correct. In fiscal year 2011, more than 10,000 people applied for a principal U visa, and the number of petitions has exceeded 10,000 in every subsequent year. *See* USCIS, I-918 Petitions.

46.     Defendants, however, quickly fell behind their stated goal of adjudicating U-visa petitions within six months and failed in their duty to provide timely waiting-list determinations to everyone who would receive U visas but for the numerical limitation.

47.     Despite their promise to place everyone eligible on the waiting list, Defendants did not do so. In fiscal year 2018, for instance, Defendants placed only 7,421 principal U-visa petitioners on the waiting list—significantly less than the number of people for whom U visas would be available the very next year. USICS, *U-visa Filing Trends* 7 (Apr. 2020).[6]

48.     By the end of fiscal year 2015, Defendants' median processing time for a waiting list determination was 14 months, and almost 64,000 principal U-visa petitioners

---

[5] https://www.uscis.gov/sites/default/files/document/legal-docs/USCIS%20Response%20to%20Ombudsman%202012%20Annual%20Report.pdf.
[6] https://www.uscis.gov/sites/default/files/document/reports/Mini_U_Report-Filing_Trends_508.pdf.

had pending petitions that had not yet received waiting list determinations. *See* USCIS, I-918 Petitions; USCIS, *Historic National Median Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year* ("*Historic Processing Time*").[7]

49.    In 2016, USCIS announced that it was assigning a second service center to U-visa adjudications, stating that it was doing so to "improv[e] processing times, efficiency and service to this victim population." *See* USCIS, *U Nonimmigrant Program Status Updates*.[8]

50.    The addition of the second service center had no such effect. At the end of fiscal year 2020, the median processing time for a waiting list determination was 54.3 months, and 161,708 principal U-visa petitions were awaiting such determinations. USCIS, I-918 Petitions.

**C.    Defendants' Twelve-and-a-Half-Year Delay in Implementing a Bona Fide Determination Process**

51.    In 2008, Congress made noncitizens with "pending, bona fide petition[s] for [U] nonimmigrant status" eligible for work authorization. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 201(c), 122 Stat. 5044, 5053 (Dec. 23, 2008), *codified in* 8 U.S.C. § 1184(p)(6). This change was intended to ensure U-visa petitioners quickly received work authorization, thus alleviating some of the harm caused by the delay in processing U-visa petitions.

52.    The Sixth Circuit has held that, under the 2008 addition to § 1184(p)(6), USCIS "*must* determine whether a U-visa petition is pending and bona fide before the

---

[7] https://egov.uscis.gov/processing-times/historic-pt.
[8] https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status/u-nonimmigrant-status-program-updates.

agency 'may' grant work authorization to the [petitioner]." *Barrios Garcia v. DHS*, 25 F.4th 430, 444 (6th Cir. 2022) (emphasis added).

53.     Determining whether a petition is bona fide does not require a full adjudication of the petition. Rather, it requires only a threshold determination that the petition was submitted in good faith and is not fraudulent. *See* USCIS Policy Manual, vol. 3, part C, ch. 5. Congress's addition of the "bona fide" language to § 1184(p)(6) therefore prescribed a method for Defendants to decrease the amount of time spent on initial U-visa adjudications—and, thus, to decrease the backlog and waiting times for those adjudications.

54.     Despite Congress's 2008 instruction and the steadily rising backlog and waiting times, Defendants failed to implement a bona fide determination process for *twelve and a half years*.

55.     On June 14, 2021, when the expected delay to be put on the regulatory waiting list had reached roughly four and a half years, *see* USCIS, *Historical National Median Processing Times*, Defendants finally promulgated policies implementing the bona fide provision of § 1184(p)(6). *See* USCIS Policy Manual, vol. 3, part C, ch. 5.

56.     Under the bona fide determination process, Defendants "first determine[ ] whether a petition is bona fide" and then, as a matter of "discretion," determine "whether the petitioner poses a risk to national security or public safety, and otherwise merits a favorable exercise of discretion." *Id.*

57.     At the first step of the process, Defendants treat a principal U-visa petition as "bona fide" if it "includ[es] all required initial evidence"—which is to say, if the petition includes (i) a completed Form I-918 Petition for U Nonimmigrant Status, (ii) an

13

unexpired law enforcement certification on Form I-918B, and (iii) a personal narrative statement about the qualifying crime, as required by 8 C.F.R. § 214.14(c)(2)(iii)—and if Defendants have "received the results of the principal petitioner's background checks." USCIS Policy Manual, vol. 3, part C, ch. 5, § A.1.

58.     Then, Defendants use the results of the background checks to determine whether the principal petitioner poses a risk to national security or public safety. If the petitioner does pose such a risk, Defendants decline to issue work authorization and deferred action as a matter of discretion. *See* USCIS Policy Manual, vol. 3, part C, ch. 5, § B.

59.     If a petition is complete and the petitioner does not pose a national security or public safety risk, Defendants issue a positive bona fide determination. *See Id.*

60.     If the principal petitioner receives a positive bona fide determination, Defendants assess whether any derivative family members submitted a bona fide Form I-918A Petition for Qualifying Family Member of U-1 Recipient; whether there is credible "evidence of the qualifying family relationship"; and whether the derivative family members completed background checks. USCIS Policy Manual, vol. 3, part C, ch. 5, § A.2.

61.     Principal and derivative petitioners who receive positive bona fide determinations are granted four years of both work authorization and deferred action. USCIS Policy Manual, vol. 3, part C, ch. 5, § C.3. These benefits are renewable until a petitioner receives a final adjudication for a U visa. *Id.* § C.6. Petitioners who receive positive bona fide determinations do not go to the regulatory waiting list. The bona fide determination process thus replaced the regulatory waiting list as a practical matter.

62.     The bona fide process should dramatically reduce the time USCIS must spend reviewing each U-visa petition and, thus, also dramatically decrease the delays before Plaintiffs and the unnamed class members could be granted interim relief.

**D.      The Extreme Delay for a Bona Fide Determination**

63.     When Defendants launched the bona fide determination process, they made clear that the wait for placement on the regulatory waiting list, which by that time had grown to more than five years, leaves "individuals vulnerable to financial instability and fear of deportation" and "can disincentivize victims from coming forward and cooperating with law enforcement." USCIS, *USCIS Issues Policy Providing Further Protections for Victims of Crime* (June 14, 2021).[9] Defendants asserted that, under the new process, "victims with pending bona fide petitions will receive the stability they need as they rebuild their lives while working with law enforcement to investigate and prosecute criminal activity." *Id.*

64.     In promulgating the bona fide determination process, Defendants further recognized that providing work authorization "to those with pending, bona fide petitions better aligns the U [-visa] program with its dual purpose as envisioned by Congress: stabilizing victims of crime and serving as a tool for law enforcement." USCIS Policy Manual, vol. 3, pt. C, ch. 5, appx. § A.

65.     In addition, Defendants expressly acknowledged that the bona fide determination process allows Defendants "to review petitions more efficiently" and to

---

[9] https://www.uscis.gov/newsroom/news-releases/uscis-issues-policy-providing-further-protections-for-victims-of-crime.

"provide the benefits of employment authorization and deferred action to more petitioners in a shorter time period than the [regulatory] waiting list." *Id.*

66.     The bona fide determination process allows Defendants to spend minimal time on each petition for a U visa before issuing a bona fide determination and the critical interim benefits that a positive determination provides.

67.     Defendants can determine whether a principal U-visa petitioner has submitted the required paperwork by applying straightforward criteria to the case, *supra* ¶¶ 56–59, merely looking for completeness of the petition.

68.     At the bona fide determination stage, Defendants make no assessment of the merits of the petition. Defendants have no need to do so because the submission of a certification of helpfulness from a federal, state, or local official "provides an appropriate assurance of the bona fide nature of the petition." USCIS Policy Manual, vol. 3, Part C, ch. 5, appx. § B.

69.     On information and belief, USCIS completes most of the work necessary for a bona fide determination when it receives a U-visa petition. In fact, USCIS will only accept a U-visa petition and issue the petitioner a receipt notice if the petition is complete and includes a completed, unexpired law enforcement certification. If it identifies a facial deficiency, USCIS returns the petition to the petitioner with a notice of the relevant issue. The only additional step Defendants must take to determine whether a petition is bona fide constitutes the de minimis step of checking for a personal statement.

70.     On information and belief, it takes Defendants less than 15 minutes to determine whether a U-visa petition is bona fide.

71.     As to the biometrics requirement, even before instituting the bona fide determination process, Defendants routinely requested background checks for every U-visa petitioner within 15 to 30 days of receiving the petition. *See Solis v. Cissna*, 2019 WL 8219790, at *13 (D.S.C. July 11, 2019) (discussing testimony given by Donald Neufeld, Associate Director of USCIS's Service Center Operations Directorate). Defendants also do so in many other contexts. *See* USCIS Policy Manual, vol. 3, Part C, ch. 5, § C.1.

72.     On information and belief, results of a background check run by Defendants are often available within 48 hours.

73.     In 2023, Defendants moved all bona fide determinations from USCIS's Vermont and Nebraska Service Centers to a new virtual service center called the Humanitarian, Adjustment, Removing Conditions, and Travel Documents ("HART") Service Center. Defendants claimed that this change would reduce processing times. *See* USCIS, *Overview of the Humanitarian, Adjustment, Removing Conditions and Travel Documents (HART) Service Center* 5 (Apr. 20, 2023).[10]

74.     Switching to a bona fide process and centralizing bona fide determinations at a single service center, however, has not decreased either the backlog or the time that U-visa petitioners must wait for an initial determination and the resulting work authorization and deferred action. By the end of fiscal year 2023, the median processing time for a bona fide determination was 57.5 months—a period three months *longer* than

---

[10] https://www.uscis.gov/sites/default/files/document/outreach-engagements/NationalEngagement-OverviewoftheHARTServiceCenter.pdf.

the period for a full, merits-based waiting list determination in 2020. USCIS, I-918
Petitions.

75.     Waiting times and the backlog have increased despite a downward trend in
the number of new U-visa petitions filed. USCIS received more than 30,000 principal U-
visa petitions in each fiscal year from 2015 to 2018, with a high point of 36,571 new
filings in fiscal year 2017. *Id.* Petitions have since declined, and in fiscal years 2020 and
2021, new filings dipped below 23,000 per year. *See id.*

76.     By Defendants' own admission, current waiting times for bona fide
determinations are inconsistent with the purposes of the U-visa program. Nevertheless,
Defendants have taken no action that has reduced those waiting times.

### III.    Defendants' Delays Have Significantly Harmed Plaintiffs

77.     Petitioners who are eligible for a U visa but wait inordinate times for a
bona fide determination live in a constant state of uncertainty and severe economic
insecurity. They must survive without work authorization, which makes these survivors
of crime vulnerable to additional harm and exploitation. They also risk removal, even
during the course of the investigation and prosecution in which they are a witness.

78.     Access to a work permit translates to more than access to legal work. A
work permit allows an individual to obtain a Social Security card, which is often needed
to pursue higher education. Work authorization also opens the door to health insurance—
and without stable jobs, petitioners who lack insurance are often unable to pay for
medical treatment, even in emergencies. In many states, work authorization is also a
prerequisite to receiving a driver's license, and thus to basic mobility.

79.     Worse still, many U-visa petitioners are survivors of domestic violence, and many suffer continued harm while awaiting their bona fide determination by remaining dependent on their abusers. A November 2023 report found that 81% of noncitizen women lacking work authorization stayed with abusive partners because they lacked stable alternate housing, and the same percentage reported that their abusers controlled household resources. Her Justice, *Stories from Immigrant Survivors of Gender-Based Violence: The Impact of Work Authorization* 6-7 (Nov. 2023) ("*Impact of Work Authorization*").[11] Once they received work authorization, *all* women reported that their housing situation improved, and 80% said they could control their family's money and make household decisions. *Id.*

80.     Defendants' delays also force U-visa petitioners to live for years with the severe stress that accompanies fear of deportation. In particular, rather than fostering *cooperation* with law enforcement—as Congress intended—the delays force petitioners to *fear* law enforcement officers and the forced removal to another country that might result from interactions with them. The November 2023 Her Justice report, for instance, found that only 40% of women without work authorization would feel comfortable calling the police for help, while *all* the survey respondents with work authorization felt comfortable doing so. *Impact of Work Authorization* 7. This disparity is consistent with prior surveys on the same topic. *See* Human Rights Watch, *How the U Visa Program Makes US Communities Safer* 20-21 (2018).[12]

---

[11] https://herjustice.org/wp-content/uploads/2023/11/Her-Justice-Policy-Report-Impact-of-Work-Authorization.pdf.

[12] https://www.hrw.org/report/2018/07/03/immigrant-crime-fighters/how-u-visa-program-makes-us-communities-safer.

81.     These concerns and harms are illustrated by the named Plaintiffs here.

**Plaintiff A.M.P.**

82.     Plaintiff A.M.P. has lived in the United States since 2007.

83.     At a time when A.M.P. was living with her sister, her acquaintance E.R. entered the home without permission. E.R. told A.M.P. that he wanted to talk and proceeded to a bedroom. When A.M.P. followed E.R. to ask him to leave, E.R. grabbed A.M.P., threw her on the bed, forced his fingers inside her vagina, and masturbated on her.

84.     A.M.P. reported the sexual assault to the police and cooperated with authorities to pursue charges.

85.     As a result of the assault, A.M.P. suffered psychological trauma, developed depression, met with a psychiatrist, and attended counseling.

86.     A.M.P. applied for a U visa on October 12, 2021, but has not yet received a bona fide determination adjudication.

87.     A.M.P. has three sons who are U.S. citizens. Her middle son has a form of eye cancer. Although he is eligible for health insurance as a citizen, he is not old enough to drive. Because she cannot obtain a driver's license without work authorization, A.M.P. has no stable means of transporting her son to his appointments.

88.     A.M.P. wishes to obtain her G.E.D. and pursue a career as an interpreter, but she cannot do so without a Social Security number and access to more stable income.

**Plaintiff G.V.S.**

89.     In or around 2007, when G.V.S. was about eight years old, she came to the United States to join her mother. She lived with her mother, her stepfather, and her younger siblings in Michigan.

90.     Beginning at the age of eight, G.V.S.'s stepfather began sexually abusing her. She was raped on multiple occasions as a child; her stepfather would wait until her mother was out of the house to corner her in the bedroom she shared with her little sisters. G.V.S.'s stepfather would hold his hand over her mouth when he abused her and tell her not to tell anyone. He was physically abusive with her mother and her siblings, including her baby brother, so G.V.S. was conditioned to understand the potentially violent consequences of disclosure. Once, he told G.V.S. that he would beat her mother and her with a belt if she told anyone. This abuse went on until G.V.S. was in middle school.

91.     G.V.S.'s stepfather was eventually deported for reasons unrelated to the sexual abuse. G.V.S. faced severe psychological consequences following the years of trauma. She started acting up in school, expressing self-loathing and self-harming thoughts, and once attempted suicide while in middle school, after which she was admitted to the inpatient psychological department at the University of Michigan hospital. After the suicide attempt, she was able to begin seeing a therapist, and still suffers the mental health consequences of her trauma as an adult.

92.     G.V.S. first told her godmother about the abuse; she encouraged G.V.S. to go to the police to report her stepfather. She described the rapes and assaults to the police in Ann Arbor, Michigan, who found her account credible enough to charge her

stepfather with a felony and issue a warrant for his arrest. Because he was deported before she reported him to the police, he has not yet been arrested. G.V.S. remains available to assist the police in their investigation and prosecution of her stepfather if he is ever apprehended.

93.     G.V.S. applied for a U visa on November 6, 2018, but she has not yet received a bona fide determination adjudication.

94.     G.V.S. and her family have faced significant hardship during the pendency of her U visa petition without work authorization. G.V.S. is now in her twenties and is totally dependent on her partner and the father of her young daughter. Because she doesn't have a work permit, a social security number, or other more stable status, G.V.S. cannot work, drive, attend school, or receive meaningful health care coverage. The public transportation system where she lives in Saginaw, Michigan is very limited, so she relies on her partner and his family to help her with attending appointments and errands.

95.     G.V.S. has dreams of becoming a teacher, but because she cannot work, she cannot afford the classes she needs to take to receive an associate degree or teaching certificate. She attends school at Delta College when she can, but because her partner is the only source of income in the house, she can only take a few classes at a time, and is still many credits away from graduating. She hasn't attended school since April 2023 because of the expense.

96.     G.V.S.'s partner is significantly older than she is, and G.V.S. worries that if he were to face any health issue that stopped him from working, that she and her

daughter would be completely without support, or opportunity to support themselves without work authorization.

97.     Without a bona fide determination on G.V.S.'s U visa petition, G.V.S. remains completely dependent and isolated. A bona fide determination would make G.V.S. eligible for work authorization, which would allow her to pursue her education, help support her daughter, participate more fully in her community, and be more independent financially.

**Plaintiff C.M.G.**

98.     Plaintiff C.M.G. escaped to the United States with her two children on or around May 10, 2019, after being kidnapped and beaten by gang members in Honduras. The same gang killed C.M.G.'s brother.

99.     After C.M.G. and her partner J.E.G. conceived a child, J.E.G. became abusive. Among other things, he tried to choke C.M.G., punched her in the stomach while she was pregnant, and threw objects at her. In addition, C.M.G.'s oldest daughter reported that J.E.G. inappropriately touched her many times.

100.     After C.M.G. started feeling contractions, J.E.G. pushed her and caused her to faint. C.M.G. reported the incident to police. She has since cooperated with law enforcement in assault and sexual abuse cases against J.E.G. even though J.E.G.'s family has threatened to harm her unless she stops cooperating.

101.     C.M.G. applied for a U visa on November 9, 2020, but has not yet received a bona fide determination adjudication.

102.     C.M.G. bears sole financial responsibility for her daughters but cannot find a stable job without a work permit. Her daughters also require dental treatment that C.M.G. cannot afford without insurance.

103.     Without deferred action, C.M.G. fears being removed to Honduras and to the gang that kidnapped and beat her and killed her brother.

**Plaintiff Felipe Emmanuel Dzib Cohuo**

104.     Plaintiff Felipe Emmanuel Dzib Cohuo has lived in the United States since 2018.

105.     Felipe previously lived in a shared apartment in California with his wife, his son, two cousins, and their families. After a dispute over whether one cousin was paying enough rent, the cousin's wife brandished a knife at Felipe and his family, screamed at them, and threatened Felipe's young son.

106.     Felipe immediately reported the incident to the police.

107.     Felipe applied for a U visa on September 23, 2020, but has not yet received a bona fide determination adjudication.[13]

108.     For a time after the assault, Felipe and his family had no stable housing and suffered food insecurity. Felipe now has an apartment but struggles to pay rent and fears becoming homeless, especially as Felipe's wife is pregnant with their second child.

109.     Felipe finds it traumatic simply to walk down the street and suffers anxiety when he sees law enforcement officers.

---

[13] Upon information and belief, Felipe may have received his bona fide determination adjudication by the time of the filing of the First Amended Complaint.  However, upon information and belief, Felipe did not receive his bona fide determination at the time of the filing of the original Complaint on December 19, 2023.

**Plaintiff A.A.**

110.    On July 12, 2009, Plaintiff A.A. entered the United States on a student visa.

111.    A.A. married not long after she entered the United States, but her husband died shortly after their marriage. After A.A.'s husband died, an acquaintance, S.B., began to pursue A.A. romantically. S.B. sexually harassed A.A. for years, and she routinely rebuffed his advances.

112.    In September 2020, S.B. forced A.A. into a car with him. A.A. tried to escape the car, and when she did, S.B. ran over her with the vehicle and dragged her more than 20 feet.

113.    A.A. sustained serious and long-lasting injuries. She was in a coma for more than a month after the event, and she had to undergo more than 20 surgeries to address broken bones as well as damage to her liver and kidneys.

114.    A.A. cooperated in the prosecution of S.B., and as a result, in 2021, he pleaded guilty to second-degree assault and accepted a sentence of five years' imprisonment with a possibility of parole thereafter. S.B. also received a restraining order prohibiting him from contacting A.A.

115.    A.A. continues to cooperate with law enforcement on this matter. Because S.B.'s five-year prison term is nearing its completion, she has provided victim statements opposing his early release on parole.

116.    A.A. applied for a U visa on July 19, 2021, but has not yet received a bona fide determination adjudication.

117.     Though A.A. had been in student status and received a master's degree in Social Work, she is unable to work in her chosen field because she does not have work authorization. As a result, A.A. struggles to make ends meet and to care for her two U.S. citizen daughters.

118.     Without deferred action, A.A. lives in constant fear of being deported. Because of her status, she does not have access to the kind of safeguards that she would otherwise have, including medical insurance.

119.     A.A. suffers from constant and severe stress from not knowing what awaits her in this country. In particular, as S.B.'s release date approaches, she lives in fear that he will harm her further after his release. She also worries for the safety and security of her two U.S. citizen daughters.

**Plaintiff B.M.R.**

120.     In or around 2000, when Plaintiff B.M.R. was about two years old, her parents brought her to the United States.

121.     When B.M.R. was approximately four or five years old, her father began sexually abusing her. He repeatedly sexually abused her over the course of most of her childhood. He also abused B.M.R.'s siblings, often in B.M.R.'s presence.

122.     In approximately 2018, B.M.R. and her siblings gathered courage and contacted the police to report their father's sexual abuse. Due to their cooperation, B.M.R.'s father was charged with seven felony counts related to the sexual abuse. B.M.R. was a key prosecution witness at her father's criminal trial, which resulted in the jury convicting him on all counts. In her sentencing order, the presiding judge

specifically recognized the trial testimony and victim statements of B.M.R. and her siblings. The judge sentenced her father to multiple 40-year prison terms.

123.    B.M.R. applied for a U visa on September 28, 2020, but has not yet received a bona fide determination adjudication.

124.    B.M.R., a single mother of two minor children, currently has employment authorization and deferred action as a beneficiary of the Deferred Action for Childhood Arrivals (DACA) program. This has allowed her to obtain a driver's license and secure a stable job that offers excellent benefits. Her employment has provided some financial stability for her and her two minor children. Through her employer, B.M.R. has a health insurance plan at no cost to her, a 401(k) plan, and life insurance. Her employer also offers funding to support pursuing a college degree, something B.M.R. may pursue in the future.

125.    However, all the stability B.M.R. has gained as a result of having work authorization and deferred action is at risk. DACA has been the subject of intense and prolonged litigation and there is a substantial risk DACA will soon end. B.M.R. knows that if DACA ends, she will lose her job and all the stability it provides her and her minor children. She would also lose her driver's license, which she needs for crucial tasks, such as driving her children to their medical appointments.

126.    B.M.R. struggles with anxiety due to the abuse she suffered and continues to receive therapy as she seeks healing. The instability of her legal status has exacerbated her anxiety. She fears that any day she may suddenly lose her work authorization, and therefore her job and driver's license, and be at risk of deportation to a country she left when she was approximately two years old. A bona fide determination

on her U-visa petition would provide continued stability and security for B.M.R. and her two minor children.

**Plaintiff K.H.A.**

127.    In 2005, when Plaintiff K.H.A. was about six years old, she was brought to the United States by family.

128.    On May 5, 2019, K.H.A. and her now ex-husband were inside their house when someone shot at their home. Their house and car were both badly damaged with bullet holes.

129.    When this shooting happened, K.H.A. and her then-husband dropped to the floor with their one-year old son to try to protect themselves from bullets that were entering the house. Despite these efforts, a bullet hit K.H.A's ex-husband in the arm.

130.    K.H.A. and her then-husband immediately called the police, and numerous officers arrived at the scene immediately thereafter to investigate. Despite these efforts, the police were unable to immediately identify the perpetrator. Nevertheless, law enforcement continued the investigation, and K.H.A. has cooperated in that effort.

131.    K.H.A applied for a U visa on November 27, 2020, but has not yet received a bona fide determination adjudication.

132.    K.H.A. has suffered significant trauma from this incident. She struggles with feelings of guilt because she was unable to shield her young son from this act of violence and worries about what kind of lasting impact this incident will have on her son. K.H.A. attended therapy to address this trauma and has moved to a new home.

133.    This fear is compounded by her fear of being deported. Like Plaintiff B.M.R., K.H.A. is a recipient of DACA, but she worries about losing the stability that

that program has offered her, given the substantial risk DACA will end soon. K.H.A.
worries about losing her work authorization and about the risk of being vulnerable to
deportation to El Salvador, a country where she has not lived for many years and where
she fears for the safety of herself and her family.

134.    In addition, K.H.A. was recently diagnosed with epilepsy and has been
informed that she is likely to require ongoing medical care. She fears that, without work
authorization and access to health insurance, she will be unable to obtain the medical care
that she needs.

**Plaintiff A.C.C. on behalf of S.C.L.**

135.    Plaintiff A.C.C. on behalf of his minor son, S.C.L., alleges the following.

136.    In 2013, when S.C.L. was about four years old, he came to the United
States with his family on a visitor visa.

137.    When S.C.L. was approximately 11 years old, his church's youth pastor
sexually assaulted him on multiple occasions. Shortly thereafter, he confided the abuse
to trusted adults and his parents helped him report the crime to law enforcement and
child protective services. The abuser was quickly arrested and charged with child
molestation.

138.    Due to S.C.L. reporting the crime and cooperating with law enforcement,
the media reported on the charges, prompting at least four other victims to come forward
and leading to additional charges against the abuser. The abuser eventually pleaded
guilty to multiple counts of child molestation and was sentenced to 20 years in prison.

139.    S.C.L. applied for a U visa on October 7, 2021, but has not yet received a
bona fide determination adjudication.

140.     S.C.L. is currently an honor roll high school student, three-sport athlete, and member of the orchestra who plans to attend college, study medicine, and pursue a career as an orthopedic surgeon. Yet he and his family suffer significant harm without a bona fide determination.

141.     Unlike many of his peers, S.C.L. is unable to apply for a learner's permit or driver's license, which would significantly ease the challenge of him attending all his extra-curricular activities. With work authorization, S.C.L. would be able to obtain a job open for him at a local restaurant, which would allow him to fulfill a dream of contributing to the household bills as his parents struggle to make ends meet.

142.     S.C.L. also fears being deported without deferred action. He fears returning to a country he hardly knows. S.C.L. believes he has found his place in the United States and recognizes that the opportunities available to him here would not be available to him if he was deported.

143.     S.C.L.'s parents and his sibling are derivatives on his U-visa application. S.C.L. is acutely aware that until he receives a bona fide determination, his parents and sibling will not be able to access work authorization or deferred action. S.C.L. recognizes how his parents struggle immensely to make ends meet for his family without work authorization and believes work authorization and deferred action would lift an enormous weight off their shoulders.

**Plaintiff J.N.C.**

144.     In or around 2005, when Plaintiff J.N.C. was about 17, he came to the United States.

30

145.    Throughout 2020, J.N.C.'s ex-boyfriend, B.S., physically and mentally abused J.N.C. As part of this abuse, B.S. threatened J.N.C.; threw J.N.C. into a wall; and struck J.N.C. in the face and head several times, requiring hospital treatment.

146.    J.N.C. reported these incidents of domestic violence to law enforcement and cooperated in the investigation and prosecution of B.S.

147.    J.N.C. subsequently received services at Mount Sinai Hospital and was referred for intensive mental health services as a result of being a victim of domestic violence.

148.    J.N.C. applied for a U visa on May 6, 2021, but has not yet received a bona fide determination adjudication.

149.    Although J.N.C. has a bachelor's degree in computer science and was offered a position as a software engineer, he is unable to work in his field without work authorization. With work authorization, J.N.C. believes he could obtain a job in his field earning up to a six-figure salary. Instead, he earns a small fraction of that amount, straining his ability to support himself and his two children, and is unable to access health insurance through his employer.

150.    J.N.C. receives ongoing treatment for Human Immunodeficiency Virus (HIV), but his lack of work authorization presents significant challenges for him and his care providers. For example, J.N.C. must apply to social services agencies for support to access necessary medications.

151.    J.N.C. dreams of having a job that pays enough for him to support himself, allow him to access quality health insurance, and allow him to financially support his children's college education.

152.    Without deferred action, J.N.C. constantly fears deportation and having to leave behind the life he has built in the United States. Because of his fear of deportation, he infrequently travels outside of the city where he lives. If he were deported, he believes he would not be able to access his HIV treatment regime and his health would suffer considerably.

## IV.    Defendants' Delays Are Unreasonable

153.    Under the APA, 5 U.S.C. § 706(1), Defendants may not unreasonably delay actions they are required to undertake.

154.    Defendants have a mandatory duty to make bona fide determinations on U-visa petitions.

155.    Courts generally apply the factors from *TRAC v. FCC*, 750 F.2d 70 (D.C. Cir. 1984), to determine whether a delay is unreasonable. *See Barrios Garcia*, 25 F.4th at 451. Those factors are as follows:

(1) the time agencies take to make decisions must be governed by a rule of reason;

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Barrios Garcia*, 25 F.4th at 451-52 (quoting *TRAC*, 750 F.2d at 80).

## A.    The Bona Fide Determination Process Is Not Governed By a Rule of Reason

156.    As to the first *TRAC* factor, Defendants' bona fide determination process is not governed by a rule of reason.

157.    Defendants claim to make bona fide determinations by applying a first-in-first-out ("FIFO") approach under which it provides determinations in the order in which petitions were received. *See* USCIS, *National Engagement – U Visa and Bona Fide Determination Process – Frequently Asked Questions.*[14]

158.    Despite Defendants' claim, USCIS makes many bona fide determinations outside the FIFO process.

159.    Defendants routinely prioritize making bona fide determinations for any U-visa petitioner who brings or threatens to bring an individual claim for unreasonable delay or for a writ of mandamus in federal court. On information and belief, Defendants prioritize requests accompanied by litigation even if the petition for U status has been pending for as little as 120 days.

160.    Defendants also claim the sole discretion to expedite bona fide determinations for individual petitions. Defendants do not "provide justification or otherwise respond regarding decisions on expedite requests" made by petitioners. USCIS Policy Manual vol. 1, part A, ch. 5.

161.    Further, on information and belief, in or around September 2023, Defendants issued bona fide determinations on a significant number of U-visa petitions

---

[14] https://www.uscis.gov/records/electronic-reading-room/national-engagement-u-visa-and-bona-fide-determination-process-frequently-asked-questions.

filed in 2021 and 2022. These petitions were not the subjects of either expedited requests or actual or potential litigation.

162.    On information and belief, Defendants have also issued bona fide determinations out of order for other petitions at various times. Defendants have not publicized any criteria used to decide which determinations are made out of order in these situations and appear to pull individual petitions out of order on an ad hoc basis.

163.    On information and belief, many U-status petitions filed after the petitions of Plaintiffs and the putative class members have received bona fide determinations even though the petitions of Plaintiffs and the class members have not.

### B.    The Lack of a Statutory Deadline for Adjudications Does Not Excuse Defendants' Delays

164.    Where "no statute sets a" specific "deadline for agency action, the second *TRAC* factor is not relevant to an 'unreasonably delayed' analysis." *Barrios Garcia*, 25 F.4th at 453. That is the case with bona fide determinations on U-visa petitions.

165.    In any event, Congress has made clear that "the processing of an immigration benefit petition should be completed not later than 180 days after the initial filing of the petition." 8 U.S.C. § 1571(b); *see Barrios Garcia*, 25 F.4th at 454.

166.    The legislative history of the statute in which Congress added the bona fide provision to 8 U.S.C. § 1184(p)(6) similarly makes clear that noncitizen victims of crime "should not have to wait for up to a year before they can support themselves and their families." 154 Cong. Rec. H10,888, 10,905 (Dec. 10, 2008) (statement of Reps. Berman and Conyers).

167.    Further, Congress has stated that the U visa is intended to "give[ ] law enforcement officials a means to regularize the status of cooperating individuals during

investigations or prosecutions." Pub. L. No. 106-386, § 1502(a)(2)(B), 114 Stat. at 1464.
Years-long delays in making bona fide determinations, however, mean that many
petitioners have no status until long after the investigation or prosecution has concluded.

**C.** **Defendants' Delays Have Severely Harmed Plaintiffs' Health and Welfare**

168.    As to the third and fifth *TRAC* factors, Defendant's delays have harmed U-
visa petitioners' health and welfare, not just their economic interest, and named Plaintiffs
and unnamed class members alike are suffering severe financial, medical, and
psychological harms as a result of those delays.

169.    Even though human health and welfare are at issue, Defendants have not
acted in ways that decrease the delays. To the contrary, the delays continue to increase.

170.    The interest of Plaintiffs and the unnamed class members in a prompt
adjudication is weighty.

**D.** **Defendants Must Make Bona Fide Determinations a Priority**

171.    As to the fourth *TRAC* factor, Defendants are required by § 1184(p)(6) to
make bona fide determinations on pending U-visa petitions. *Barrios Garcia*, 25 F.4th at
444.

172.    The time needed to complete a bona fide determination for a U-visa
petitioner is minimal, and the process substantially overlaps with steps that USCIS
routinely takes when it receives and receipts a U-visa petition.

173.    Defendants have long recognized the importance of making prompt bona
fide determinations for petitioners seeking U visas.

174.    Without such prompt determinations, the U-visa program's congressional
purposes in protecting victims and apprehending criminals cannot be fulfilled.

175.    Because U-visa petitioners have, by definition, been the victims of serious crimes in the United States and typically lack any other immigration status, U-visa petitioners are among the most vulnerable populations applying for benefits. *See* https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-1 (purpose of the U visa was to protect victims of crime who have suffered substantial mental or physical abuse through crimes such as domestic violence, sexual assault, and trafficking); Brief of *Amici Curiae* Non-Profit Organizations in Support of Appellants, *V.U.C.; P.C.C. v. USCIS et al.*, 2021 WL 5998322 (1st Cir. Dec. 8, 2021) (No. 21-1778).[15]

176.    Defendants can make significantly more bona fide determinations each year than they have since the creation of the bona fide determination process in 2021.

## CLASS ACTION ALLEGATIONS

177.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of a class of themselves and all others who are similarly situated.

178.    Plaintiffs seek to represent the following proposed nationwide Class: All individuals whose principal petitions for U nonimmigrant status have been on file with USCIS for more than two years and have not received a bona fide determination adjudication pursuant to 8 U.S.C. § 1184(p)(6) and USCIS Policy Manual volume 3, part C, Chapter 5.

179.    Pursuant to Rule 23(a)(1), the members of the proposed Class are so numerous that joinder of all potential class members is impracticable. Although Plaintiffs are not aware of the exact number of class members, as of the end of fiscal year 2021,

---

[15] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.tahirih.org/wp-content/uploads/2021/12/VUC-USCIS-Amicus-Brief-1.pdf.

more than 170,000 principal U-visa petitions remained pending without a bona fide

determination adjudication. *See* USCIS, I-918 Petitions. In the intervening two fiscal

years, Defendants report having made under 70,000 bona fide determination

adjudications on principal U-visa petitions, which has barely kept pace with new

principal U-visa petitions added to the backlog during that same period. USCIS, *Form-*

*918, Petition for U Nonimmigrant Status, Bona Fide Determination Review* (FY 2023,

Qtr. 4).[16] Accordingly, the class is confidently in the thousands and thus so numerous that

joinder of all potential class members is impracticable. The members of the proposed

Class are readily identifiable by Defendants.

180.    Under Rule 23(a)(2), there are questions of law and fact common to the

proposed Class, including whether Defendants have a duty to provide bona fide

determinations and whether Defendants' delay in providing those adjudications is

unreasonable. This action challenges Defendants' delay in adjudicating bona fide

determinations for U-visa petitions, which is a practice or policy affecting all members of

the proposed Class.

181.    Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the

proposed Class because each named Plaintiff submitted a U-visa petition at least two

years ago and has not received a bona fide determination adjudication.

182.    Pursuant to Rule 23(a)(4), Plaintiffs will fairly and adequately represent

the interest of the proposed Class and have retained counsel from the National Immigrant

Justice Center, the Michigan Immigrant Rights Center, and Winston & Strawn LLP, who

---

[16] https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-
data?topic_id%5B%5D=33695&ddt_mon=&ddt_yr=&query=&items_per_page=10.

are experienced in federal litigation, class action litigation, and litigation concerning U.S. immigration laws. Plaintiffs have no interests that are antagonistic to the interests of the class, and the relief that Plaintiffs seek will benefit all members of the class.

183.    Pursuant to Rule 23(b)(2), Defendants have acted in ways generally applicable to the proposed Class, and injunctive and declaratory relief is proper with respect to the class as a whole.

## **COUNT ONE**

**Unreasonable Delay in Making Bona Fide Determinations Under the APA, 5 U.S.C. § 706(1)**

184.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as if set forth fully herein.

185.    The APA requires every federal agency to "proceed to conclude a matter presented to it . . . within a reasonable time." 5 U.S.C. § 555(b).

186.    The APA vests this Court with jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

187.    Pursuant to 8 U.S.C. § 1184(p)(6) and USCIS Policy Manual volume 3, part c, chapter 5, Defendants have a nondiscretionary duty to make a bona fide determination on Plaintiffs' U-visa petitions.

188.    According to Congress, "the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1571(b).

189.    Bona fide determinations implicate significant health and welfare concerns, such as the ability to generate income through work, provide shelter and sustenance for children, family integrity, and liberty.

190.     Plaintiffs and the unnamed class members are prejudiced by Defendants' unreasonable delays in making bona fide determination adjudications.

191.     Defendants' failure to make timely bona fide determination adjudications for Plaintiffs and the unnamed class members constitutes an unreasonable delay in violation of 5 U.S.C. § 555(b).

192.     Defendants' unreasonable delay has caused and will continue to cause Plaintiffs and the unnamed class members substantial and irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully ask the Court to:

1.     Assume jurisdiction over this matter;

2.     Certify the Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

3.     Appoint all Plaintiffs as representatives of the Class;

4.     Appoint the National Immigrant Justice Center, the Michigan Immigrant Rights Center, and Winston & Strawn LLP as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

5.     Issue a judgment declaring that Defendants' delay in providing bona fide determination adjudications for U-visa petitions submitted by Plaintiffs and the class is unreasonable;

6.     Issue an order under 5 U.S.C. § 706(1) compelling Defendants to provide bona fide determination adjudications to Plaintiffs and the Class within 180 days;

7.      Retain jurisdiction over this action and any attendant proceedings until Defendants have complied with this Court's order;

8.      Award Plaintiffs reasonable fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable law; and

9.      Grant any and all such other relief as the Court deems just and proper.

Date: February 9, 2024                    Respectfully submitted,

*/s/ Kurt Mathas*
Kurt Mathas (IL 6286812)
Elizabeth Deshaies (IL 6318238)
Savannah Murin (IL 6339430)
Greer Harrison (IL 6345805)
**Winston & Strawn LLP**
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
KMathas@winston.com
LDeshaies@winston.com
SMurin@winston.com
GHarrison@winston.com

Mark Fleming (NY 4487534)
Richard Caldarone (VA 76565)
Jess Hunter-Bowman (IN 34647-71)
**National Immigrant Justice Center**
111 W. Jackson, Suite 800
Chicago, IL 60604
(312) 660-1628
mfleming@immigrantjustice.org
rcaldarone@immigrantjustice.org
jbowman@immigrantjustice.org

Meredith Luneack (MI P84886)
**Michigan Immigrant Rights Center**
15 South Washington Street, Suite 201
Ypsilanti, MI 48197
(734) 239-6863
mluneack@michiganimmigrant.org

*Counsel for Plaintiffs*